## MATTER OF KOJOORY

## In Deportation Proceedings

## A-10474028

*Decided by Board May 11, 1967*

A native and citizen of Iran who makes no claim to persecution prior to leaving Iran in 1956 nor to the persecution of his family there on account of his activities in the United States has not established that solely because of his very strenuous and public activities in this country against the Shah of Iran he would be subject to persecution on account of political beliefs within the meaning of section 243(h) of the Immigration and Nationality Act, as amended, if deported to Iran.

CHARGE:

Order: Act of 1952—Section 241(a)(2) [8 U.S.C. 1251(a)(2)]—Nonimmigrant student—Remained longer.

ON BEHALF OF RESPONDENT:
David Carliner, Esquire
902 Warner Building
Washington, D.C. 20004
(oral argument)
Sidney M. Kaplan, Esquire
156 S. Broadway, Suite 818
Los Angeles, Calif. 90014

ON BEHALF OF SERVICE:
Irving A. Appleman
Appellate Trial Attorney
(oral argument)

Respondent appeals from the decision of the special inquiry officer denying suspension of deportation, denying the stay of deportation under section 243(h), and granting voluntary departure with an alternate order of deportation to Iran if respondent should fail to depart when and as required.

Respondent is a 32-year-old single male alien, a native and citizen of Iran who last entered the United States on January 9, 1956, as a nonimmigrant student. His authorized period of stay expired on April 1, 1965 and he remained beyond that time without authority. He concedes deportability on the charge in the order to show cause.

Respondent's applications for suspension and a 243(h) stay are interconnected, depending for the most part on the same facts. We shall, however, consider them separately and we turn to suspension first.

It has been established that respondent has been physically present in the United States since his entry in January 1956, without interruption, a total of 11 years; that he has been a person of good moral character for at least the past seven years; and the character investigation and Federal Bureau of Investigation report show nothing adverse to him. Since he has neither parent, spouse nor child who is a citizen or lawful permanent resident of the United States, he must show that deportation would result in extreme hardship to him.

Respondent claims four areas of hardship:

(1) he has engaged in political activities in the United States against the Shah of Iran and would be physically persecuted, imprisoned or even tortured if he returned to Iran;

(2) his economic opportunities in Iran would be severely limited as part of such persecution;

(3) he would have difficulty finding work in Iran, politics aside, because he claims there is no market in Iran for advertising design and commercial art, his own particular field;

(4) he would have difficulty adjusting to the lower standard of living in Iran because after 11 years here he has become accustomed to our way of living.

We consider first the factors of employment and standard of living. Respondent's claim that there is no market in Iran for advertising design or commercial art, it may be pointed out, rests entirely on his unsubstantiated statement that this is so. He testified that when he came to the United States as a student, he was undecided on what area to concentrate his studies in. He soon decided on architecture, a field in which he testified there was opportunity in Iran. However, at some point, and he gave no reason why it was done, he switched his professional focus from architecture and went into the advertising and commercial art field. There is no claim that this was not entirely voluntary or that opportunities in this field in Iran have in any way changed between the time he decided to go into it and the present. Voluntary choice by a student of a field or profession which he may not be able to follow in his own country should not weigh in his favor on a later claim of hardship; to permit it to do so might be to encourage unwise vocational choices.

Difficulty in adjusting to a lower standard of living in Iran is not very persuasive of extreme hardship. Return to Iran, with or without a profession which he could profitably practice in that country, would almost inevitably entail for the respondent an adjustment to a lower standard of living. There is no showing that this would be worse for him than for any student who returns to a native country which is not on the same economic level as the United States. Respondent has

no one dependent upon him for support and there is no evidence that he would be in any worse situation economically than he was when he left Iran to come to the United States to study. In fact, there are indications that he has acquired certain salable skills here which he did not have then (see Tr. pp. 55, 56), over and above the ones he spent ten years in acquiring and which he claims would be useless.

Respondent's claim of limited economic opportunities in Iran because of political persecution has not been substantiated, and is difficult to sustain as a separate ground of hardship, since he has already urged that his economic opportunities in Iran would be almost nil as a result of his voluntary choice of a professional field for which there is no market in that country.

Respondent's case is bare of other equities. He is single, without family in the United States (although his mother and sister were in the United States as visitors at the time of the hearings, he stated that they intended to return to Iran). He is within the category of applicants looked on with disfavor by the Congress (H. Rept. 1167, 89th Cong., 1st sess., October 14, 1965, to accompany H.R. 606) as persons who have completed the years of residence required for suspension in a "protected" status. Although we have held that even in the case of such a person the Board might grant suspension if there were outstanding equities, we do not find such equities here.

We consider now respondent's claim that he would be persecuted upon his return to Iran because of his political beliefs. The record shows that he was never politically active in Iran before coming to the United States, and that he did not become politically active here until almost six years after his arrival. At that time he joined an Iranian student organization which is in strong and vocal opposition to the Shah of Iran. There is no doubt that respondent has been prominently involved in this movement and it seems likely that he is known as a participant by the government of Iran. He is president of the Southern California Chapter of that organization and his name is listed in its newspaper as a contributing editor. He is the artist responsible for a highly critical caricature of the Shah published in that newspaper. The file also contains photographs published in various newspapers of fairly large circulation in the area, including the Los Angeles Times, showing respondent as one of a group of demonstrators who picketed against the Shah when he was in the United States in 1964.

Respondent and his witness contend that Iran is a police state, with no civil liberties and no right to make statements in opposition to the Shah. Although there are several political parties in that country, it is claimed by respondent that there is no such thing as an opposition

party, that the parties differ only in respect of minor political issues, and are all pro-Shah.

It is respondent's claim, substantiated by his witness, Dr. Norton Frank Kristy, that he would be in serious danger of his life if he were to return to Iran, regardless of whether he continued his anti-Shah activities after arriving there, and based solely upon his very strenuous and public activities against the Shah in this country. Respondent cited the trial of several people in Iran in 1965, charged with having been party to a plot to assassinate the Shah. Many of them were students who had studied abroad and who had expressed opposition to the Shah. Respondent claims they were prosecuted not because of complicity in the assassination plot, of which they were innocent, but because of political opposition to the Shah. However, the file does not establish that these people were made defendants in this proceeding solely because of their political activities. Respondent also cites the case of a friend one Firoz Tartoufy, a graduate of MIT, who, according to respondent's statement, returned to Iran and was imprisoned, and was released only because of intercession by the professors at MIT and the United States State Department.

Respondent's witness, Dr. Kristy, has a doctorate in economics and has worked on a very high level with the government of Iran, as well as with an oil consortium, in making plans for overall development of Iran. He was in Iran from October 1960 until August 1962 and has not been there since that time. Dr. Kristy described the situation in Iran in terms similar to those used by respondent, stressing that it was a police state with no civil liberties, and that the secret police organization, "SAVAK", had considerable power to imprison and even kill people without being accountable to anyone. It was his statement that most of such action was directed against student intellectuals. He agreed with the claim that even if respondent were to be totally inactive politically upon his return to Iran, he would be in serious danger of his life because of the activities he conducted here, which the witness believed to be well known to the Shah. No proof, however, has been adduced of these claims other than the statements by respondent and his witness, and the witness himself has admitted that conditions have changed slightly for the bettter in Iran since his departure in 1962.

The file contains a letter from the Department of State (Ex. 12) in which it is stated that according to information received by the State Department, opposition to the Shah's regime without more does does not subject an individual to persecution, whether the opposition occurred in Iran or abroad, but that a returning citizen would be subject to the laws of Iran for any acts following his return. The

letter states further that numerous Iranian students, some of whom have been involved in anti-Shah activity abroad, have returned to Iran and have not "without additional action on their part" been subject to persecution.

Respondent makes no claim to having ever been persecuted prior to leaving Iran, nor does he claim that his father, mother, sisters and brothers have ever been persecuted in Iran on account of his activities. He states that they are completely politically inactive. Respondent, in his application for a stay, stated that his grandfather had been assassinated in 1946 because of his opposition to the regime then in power. This has no great bearing on respondent's case, not only because of the remoteness of that event, but because there is no showing that it was ever used as a reason or basis for persecution of respondent's family by the Iranian Government.

The burden is on the respondent, as the applicant for relief, to establish to the satisfaction of the Attorney General that he would be subject to persecution if he were to return to Iran. The material in the file is in conflict, respondent and his witness testifying that repondent would be so persecuted, although the witness has no firsthand knowledge of present day conditions in Iran, and the letter from the State Department claiming that unless respondent were active after his return he would not be persecuted for his activities here. Respondent's application is weakened also by the fact that he participated in absolutely no political activity of any sort prior to coming to the United States. In *Matter of Nghiem*, Int. Dec. No. 1569, decided April 6, 1966, we held:

For the most part the Board has not considered that joining protest groups and making public statements after entering the United States supports a withholding of deportation under section 243(h). Many aliens have attempted to build up a 243(h) case by this sort of activity. * * *

On the record before us we do not believe respondent has borne the burden of establishing that he will be persecuted on account of race, religion or political beliefs if returned to Iran, and we hold that denial of a stay of deportation under section 243(h) was correct.

Counsel asserts that even if the claim of physical persecution is not sufficient to justify a stay under section 243(h), it can be considered an aspect of hardship in the suspension application. We have ruled on a similar contention in *Matter of Liao*, Int. Dec. No. 1446, where the suspension and 243(h) stay applications depended upon many of the same facts. We stated in that case, "We are of the opinion that the political aspect of this case has no relation to a determination of 'extreme hardship' under section 244(a)(1)." Where a respondent cannot establish the necessary hardship for suspension, we do not believe that

219

a claim of persecution should be used to make up the deficit. The remedy available where the likelihood of persecution can be satisfactorily established is a stay of deportation under section 243(h).

We believe that the decision of the special inquiry officer was correct and that respondent is eligible solely for voluntary departure which has been granted to him. We will, therefore, affirm the decision and dismiss the appeal.

**ORDER:** It is ordered that the appeal be and the same is hereby dismissed.